**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| AMERICAN ASSOCIATION OF NURSE ANESTHESIOLOGY, | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) ) | |
| Xavier Becerra, in his official capacity as the Secretary of the United States Department of Health and Human Services; UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) ) ) ) | Hon. |
| Defendants. | ) ) ) | |

## COMPLAINT

Plaintiff American Association of Nurse Anesthesiology ("AANA") brings this complaint to compel the Department of Health and Human Services ("HHS"), and its Secretary, Xavier Becerra, to fulfill their duties to enforce the nondiscrimination provision of the Patient Protection and Affordable Care Act ("ACA"). AANA's membership, composed of Certified Registered Nurse Anesthetists ("CRNAs"), have faced blatant discrimination from insurers based solely upon their licensure, in direct violation of the ACA. 42 U.S.C. § 300gg-5. HHS's failure to enforce the law is causing serious and ongoing harm and will result in more harm without immediate action. The agency's unreasonable delay is unlawful and contrary to clear statutory text. This Court must compel HHS to act.

1

## INTRODUCTION

1.      Certified Registered Nurse Anesthetists ("CRNAs"), sometimes referred to as healthcare's best kept secret, are anesthesia providers who administer the majority of anesthetics to patients every day across the country.  CRNAs provide quality anesthesia services equivalent to those performed by physician anesthesia providers, albeit CRNAs actually administer the majority of anesthesia in the United States.  But they now are being discriminated against based on their licensure, in violation of federal law, by reducing the reimbursement for anesthesia administered by CRNAs.

2.      This case is being brought because multiple commercial insurance companies and health plans are discriminating against CRNAs by paying CRNAs less than physician anesthesia providers based solely upon their licensure.  The law requires that the focus be on the degree of the care provided and not the degree of the care provider.

3.      CRNAs are trained, credentialed, and licensed independent practitioners whose scope of practice enables them to administer anesthesia to all types of patients, for all types of procedures, in every setting in which anesthesia is administered.  CRNAs and physician anesthesia providers administer the same anesthesia to the same patients in the same settings for the same procedures utilizing the same equipment with the same focus on patient care and producing the same quality outcomes.

4.      Nurse-administered anesthesia is not a new practice.  The first nurse anesthetist was Sister Mary Barnard in Erie, Pennsylvania in 1877.  The National Association of Nurse Anesthetists (predecessor to the AANA) was founded in Cleveland, Ohio on June 17, 1931.

2

5.     Since then, nurse anesthesia providers have provided vital services to countless patients throughout the world, administering more than 50 million anesthetics to patients each year.  *See* https://www.aana.com/about-us/about-crnas/, last visited September 26, 2024.  And today, from coast to coast, CRNAs administer a notable majority of all anesthesia in the United States.  This is particularly true for indigent, underserved, and/or rural communities—many of whom are reliant upon CRNAs for access to anesthesia care.

6.     Unfortunately, insurance companies and health plans have unilaterally and arbitrarily decided that CRNAs are worthy of less reimbursement than their physician counterparts, despite providing the same care to patients, with the same outcome, utilizing the same equipment, and employing the same processes.

7.     Section 2706(a) of the Public Health Service Act prohibits discrimination against providers acting within the scope of their licensure.  42 U.S.C. § 300gg-5.  Under the statute, CRNAs acting within their licensed capacity and providing the same care as a physician anesthesia provider warrant being reimbursed at the same rate.  That has long since been the standard, and insurance companies' and health care plans' recent change in this practice is rationalized by nothing more than the distinction in the license of the care provider.  These insurers have implemented a process by which they are openly and unabashedly discriminating against CRNAs by paying CRNAs less than the physician anesthesia providers performing the same task.

8.     Given this brazen discrimination, CRNAs are in dire need of recourse.  The law provides one.  When insurers violate the ACA's non-discrimination provision, HHS is obligated to enforce the law and take action against insurance companies that discriminate against providers based solely on their licensure.  42 U.S.C. § 300gg-22.

3

9.      But HHS has simply failed to do so.  In the near 15 years since the passage of the ACA (which created the nondiscrimination statute), HHS has never enforced the provider nondiscrimination provision of the ACA.

10.      Emboldened by the government's clear abdication of its duty, insurance companies have arbitrarily cut CRNA reimbursement rates.  Major insurer Cigna was the first to implement this practice on March 12, 2023. Anthem Blue Cross Blue Shield announced such reductions on August 1, 2024, and others will follow suit.

11.      CRNAs cannot take direct action.  That is because the ACA precludes a private cause of action to address this discrimination.  Only the government can enforce the statute. Indeed, it is the government's *duty* to do so.  And that is all Plaintiff asks for here: An order requiring HHS to implement Congress's commands, evaluate the circumstances, and enforce the ACA against companies brashly discriminating against CRNAs.

12.      Plaintiff thus brings this action under the Administrative Procedure Act and the mandamus statute, 28 U.S.C. § 1361, seeking an order requiring HHS to carry out its constitutionally required duty to enforce the law.

**PARTIES**

13.      Plaintiff AANA is a professional association for nurse anesthesia providers and CRNAs comprising of more than 65,000 members across the United States.  Its members provide patient care in all 50 states and territories and routinely provide nonmedically directed anesthesia.

14.      Plaintiff's membership includes more than 3,000 CRNAs in Ohio who regularly administer anesthesia.  When a CRNA performs services independently, as they are trained and licensed to do, they bill their services to private insurers such as Anthem Blue Cross Blue Shield,

Cigna, and others utilizing the QZ modifier, the reimbursement of which is at issue here. In addition to the intrinsic harm of being discriminated against, this discrimination impedes patients' access to safe quality care by impacting access to anesthesia services.

15.     Defendant Xavier Becerra is the Secretary of Health and Human Services, sued in his official capacity.

16.     Defendant the United States Department of Health and Human Services ("HHS") is an agency of the United States government operating at the direction of the Secretary of Health and Human Services. HHS is responsible for enforcing the ACA's non-discrimination provision at issue here. 42 U.S.C. §§ 300gg-5, 300gg-22.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1361 and 5 U.S.C. §§ 702, 706.

18.     This Court has authority to enter declaratory relief under 28 U.S.C. §§ 2201, 2202, and injunctive or mandamus relief under 5 U.S.C. §§ 705, 706, and 28 U.S.C. § 1361.

19.     Venue is proper in this Court under 5 U.S.C. § 703 because this is a "court of competent jurisdiction."

20.     Venue is also proper in this Court under 28 U.S.C. § 1391(e)(1)(B) because a defendant is an officer of the United States or an agency thereof and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. Specifically, Anthem recently issued a reimbursement policy update reducing "modifier QZ reimbursement from 100% to 85%". That policy will affect CRNAs in the Northern District of Ohio. *See Anthem Blue Cross Blue*

*Shield  Commercial  Reimbursement  Policy  C-09002*,
https://www.anthem.com/docs/public/inline/C-09002.pdf, Ex. A.

## FACTUAL BACKGROUND

I.  **CRNAs Provide the Exact Same Anesthesia Care as Do Physician Anesthesia Providers**

21.  The AANA remains the sole advocacy organization representing this nation's nearly 74,000 CRNAs and Resident Registered Nurse Anesthetists ("RRNA"). It is the mission of the AANA to advance, support, and protect nurse anesthesiology and its CRNA and RRNA members. AANA is the Plaintiff here. *See* www.aana.com/about-us/.

22.  CRNAs routinely administer anesthesia independently without the need for supervision and as the only trained anesthesia provider responsible for the patient's care.

23.  Every year, CRNAs administer tens of millions of anesthetics to patients around the country. *See* www.aana.com/about-us/about-crnas.

24.  CRNA preparation requires ten years of education and experience and a background in critical care or ICU care. CRNAs are the only anesthesia providers with a requirement of critical care experience prior to formal anesthesia education.

25.  Current standards require all RRNA's entering an accredited CRNA program must be enrolled in a doctoral program.

26.  As of 2023, graduates of nurse anesthesia programs average 9,369 hours of clinical experience, including 733 hours during their baccalaureate nursing program, 6,032 hours as a critical care registered nurse, and 2,604 hours during their nurse anesthesia program. *See id*.

27.     Moreover, throughout their careers, CRNAs must recertify every four years which requires demonstrating continuing education and competency throughout two four-year cycles. *See id.*

28.     Physician anesthesia providers—doctors who attended medical school—also administer anesthesia.  They, too, are trained and licensed to administer anesthesia independently.

29.     Sometimes, CRNAs, physician anesthesia providers, and other professionals work collaboratively to deliver anesthesia to patients.

30.     Other times, CRNAs will administer anesthesia under the "medical direction" of a physician anesthesia provider, a reimbursement model that allows the physician anesthesia provider to bill for anesthesia being administered by up to four CRNAs at once, if they meet seven specific requirements.

31.     Under the Medicare statute, CRNAs can bill Medicare Part B for their services at 100% the physician fee schedule in each of the 50 States, regardless of whether they are administering anesthesia independently or under physician supervision.

32.     Educational differences between physicians and nurses play no role in and are entirely unrelated to the safe and effective administration of anesthesia.    In fact, there are no material distinctions between the educational experience of a CRNA and physician anesthesia provider ***when it comes to the safe administration of anesthesia***.  There is no aspect of education or training as to how to safely administer anesthesia that is "reserved" only for physicians.  Put another way, the profession who is responsible for the notable majority of the safe administration of anesthesia in this country each day is not "lesser trained" to perform these services.  There are no components of anesthesia that are completed only by CRNAs—or only by physicians.  Each

7

profession is fully trained to safely administer anesthesia.  A CRNA can (and does) independently perform all aspects of anesthesia that a physician anesthesia provider can undertake.

33.     Patient outcomes are unaffected by whether a CRNA or physician administers the anesthesia independently or whether the anesthesia is administered utilizing an oversight or collaborative model.  Said another way: CRNAs and physician anesthesia providers do the same thing at the same level, and they adhere to the same standards.  Anesthesia is unique.  When administered by a trained, licensed, and credentialed physician, it is the practice of medicine. When administered by a trained, licensed, and credentialed CRNA it is the practice of nursing. The degree of the care provided is the same—even though the degree of the care provider is not.

## II.     CRNA Reimbursement and the Affordable Care Act's Nondiscrimination Provision

34.     CRNAs are professionals licensed by the states in which they practice, including by the Ohio Board of Nursing.  CRNAs must also maintain professional certification from the National Board of Certification and Recertification for Nurse Anesthetists.

35.     CRNAs are qualified to make independent judgments regarding all aspects of anesthesia care based on their education, licensure, certification, and experience.

36.     As mentioned above, while circumstances sometimes exist where reimbursement models result in CRNAs being "supervised" or "medically directed" they do not constitute limitations upon a CRNA's scope of practice, nor a restraint upon the ability or capability of a CRNA to administer any anesthesia.

37.     The Center for Medicare and Medicaid Services' ("CMS") supervision requirement for hospitals provides that "unless the hospital is located in a State that has chosen to opt out of the CRNA supervision requirements, a CRNA administering general, regional and monitored

8

anesthesia must be supervised [ ] by the operating practitioner who is performing the procedure…" Medicare supervision requirements are a condition of Medicare reimbursement, are not evidence based, and do not improve patient safety. *See* CMS Interpretive Guidelines for § 482.52(A) and (C), Pub 100-07; *see also* 485.639(c)(2), 416.42(b)(2).

38.    This means that the "supervision" is oftentimes provided by the operating practitioner performing the underlying procedure, despite the "supervising" individual having no more training in the administration of anesthesia than anyone drafting or reading this Complaint.

39.    States are allowed to "opt out" of CMS' supervision requirements if the Governor of the state submits a letter to CMS:

> attesting that he or she has consulted with State Boards of Medicine and Nursing about issues related to access to and the quality of anesthesia services in the State and has concluded that it is in the best interests of the State's citizens to opt-out of the current physician supervision requirement, and that the opt-out is consistent with State law, then a hospital may permit a CRNA to administer anesthesia without operating practitioner or anesthesiologist supervision.

CMS Interpretive Guidelines for § 482.52(A) and (C), Pub 100-07; 42 C.F.R. §§ 482.52(c)(1),485.639(e) (1), 416,42 (c)(1).

40.    Opting out of CMS supervision requirements allows CRNAs to practice independently and significantly improve access to anesthesia services, especially in rural and underserved areas where there may be a shortage of anesthesia providers.

41.    Twenty-five out of 50 states and Guam have already opted out of CMS' physician supervision requirements for CRNAs. *See* https://www.aana.com/wp-content/uploads/2023/10/Fact-Sheet-Concerning-State-Opt-Outs-10.pdf.

42.    Medical Direction is a creation of the Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA") and allows for a physician anesthesia provider to bill for services being

performed by CRNAs (up to four CRNAs doing concurrent cases) by providing direction and oversight.  42 C.F.R. § 45.110.

43.    Reimbursement for anesthesia services, at its most basic, takes the following form:

a.    Billing codes determine the amount that providers are to be reimbursed. Those include a procedure code—commonly referred to as a CPT code—that reflects the procedure being performed.

b.    For anesthesia, a modifier is utilized that denotes what type of provider administered the services and in what context.

c.    A physician anesthesia provider utilizes modifier AA.

d.    A CRNA administering anesthesia under Medical Direction will utilize the modifier QX (reflecting they are being medically directed) and the physician anesthesia provider will utilize the modifier QY or QK (reflecting medical direction of up to four concurrent anesthesia procedures).

e.    A CRNA administering anesthesia without Medical Direction (regardless of whether they furnish anesthesia in a state that has opted out of the physician supervision requirements) will utilize the modifier QZ.

f.    Under the Medicare Fee Schedule, CRNAs receive reimbursement at 100% of the Medicare physician fee schedule.  This has long since been established.

g.    How this works, as a practical matter, is depicted below postulating a circumstance in which the reimbursement for anesthesia was $100:

| Provider / Model | Modifier | Payment for Service |
|---|---|---|
| Physician Anesthesia Provider | AA | $100 |
| Medical Direction<br><br>CRNA<br><br>Physician Anesthesia Provider Providing Medical Direction | <br><br>QX<br><br>QK/QY | $100 total:<br><br>$50 for CRNA<br><br>$50 for Physician Anesthesia Provider |
| CRNA (supervised or not) | QZ | $100 |

h.   The discriminatory model offers a lower payment for the exact same service with the only distinction being the payment of CRNAs because of their license.  Under this model, reimbursement for the same example would be as follows:

| Provider / Model | Modifier | Payment for Service |
|---|---|---|
| Physician Anesthesia Provider | AA | $100 |
| Medical Direction<br><br>CRNA<br><br>Physician Anesthesia Provider Providing Medical Direction | <br><br>QX<br><br>QK/QY | $100 total:<br><br>$50 for CRNA<br><br>$50 for Physician Anesthesia Provider |
| CRNA (supervised or not) | QZ | $85 |

44.    The ACA does not permit such discrimination based solely on licensure. 42 U.S.C. § 300gg-5(a).

45.    CRNAs and physician anesthesia providers perform precisely the same tasks.  They serve precisely the same patients.  They utilize the same equipment, the same processes, the same drugs, and both yield overwhelmingly the same positive results.

46.    Recognizing this fact, Congress passed the Omnibus Reconciliation Act of 1986, which recognized the right of CRNAs to bill Medicare Part B for their services at 100% of the fee schedule—the first nursing specialty to earn that right.  Thus, CMS has recognized that CRNAs and physician anesthesia providers perform the same service, for the same patients, with the same patient-safety outcomes, while adhering to the same quality performance standards.

47.    While not bound to follow the Medicare Part B fee schedule, the established practice for many years has been that insurance companies, like CMS, reimbursed CRNAs at 100 percent of the physician fee schedule when utilizing the QZ modifier.

11

48.     Paying CRNAs less than physicians—when this distinction is based upon nothing more than the license of the provider—does seemingly (if not blatantly) violate the ACA's explicit prohibition against insurers discriminating against providers based solely on licensure.  The law states:

> A group health plan and a health insurance issuer offering group or individual health insurance coverage shall not discriminate with respect to participation under the plan or coverage against any health care provider who is acting within the scope of that provider's license or certification under applicable State law. This section shall not require that a group health plan or health insurance issuer contract with any health care provider willing to abide by the terms and conditions for participation established by the plan or issuer. Nothing in this section shall be construed as preventing a group health plan, a health insurance issuer, or the Secretary from establishing varying reimbursement rates based on quality or performance measures.

42 U.S.C. § 300gg–5(a).

49.     This non-discrimination provision has been in place since 2010 when the ACA was signed into law.

50.     This provision is designed to protect professionals, such as CRNAs, from receiving less reimbursement from payors based only on their license.  In doing so, the law ensured that patients had more choices and that services remained affordable.  It also, importantly, ensures access to care in the indigent and rural communities, many of which are reliant solely upon CRNAs for access to anesthesia care.

51.     To enforce the law, Congress empowered the states and the Secretary of HHS to bring actions against companies who discriminate based on providers' licenses.  Specifically, the law states:

> In the case of a determination by the Secretary that a State has failed to substantially enforce a provision (or provisions) in this part or part D with respect to health insurance issuers in the State, the Secretary shall enforce such provision (or provisions) under subsection (b) insofar as they relate to the issuance, sale, renewal,

and offering of health insurance coverage in connection with group health plans or individual health insurance coverage in such State.

42 U.S.C. § 300gg–22(a)(2)

52.     Others, disinclined to await the government to take action, have unsuccessfully sought to enforce the nondiscrimination provisions of the ACA on their own.

53.     Courts have long held that this provision vests the Secretary of HHS with the authority to enforce the law and does not provide a private right of action.  *E.g.*, *Presque Isle Colon and Rectal Surgery v. Highmark Health*, 391 F. Supp. 3d 485, 512 (W.D. Pa. 2019) ("the ACA expressly provides that only the States and secondarily the Secretary of the Department of Health and Human Services may enforce the antidiscrimination provision. 42 U.S.C. § 300gg-22. It is therefore not silent on the issue of enforcement, it determines precisely who may and may not sue to enforce its provisions."); *Mills v. Bluecross Blueshield of Tenn., Inc*., No. 3:15-cv-552-PLR-HBG, 2017 WL 78488, at *6 (E.D. Tenn. Jan. 9, 2017) (ACA "expressly left enforcement of" 300gg-5 "to the states and the Secretary of Health and Human Services, not individuals.").

54.     Yet, for more than a decade, HHS has *never* enforced this provision nor even attempted to ascertain whether States have enforced the law. Indeed, despite this clear statutory mandate, neither the States, nor HHS has brought *any* action to enforce the law.

55.     That is not for lack of knowledge of discrimination.  HHS is well aware that discrimination is occurring.  Indeed, many industries have written to HHS pleading for HHS to invoke its statutory powers to put an end to discrimination in violation of the ACA.  Yet, HHS has taken no action to do so.

56.     Appreciating the lack of any enforcement of the non-discrimination provisions of the ACA, Congress doubled down on the need for this law.  In 2020, Congress passed the No

Surprises Act, Public Law 116-260, 134 Stat. 1182, Division BB, § 109, which requires that HHS, the Secretary of Labor, and the Secretary of the Treasury "shall issue a proposed rule implementing the protections of section 2706(a) of the Public Health Service Act."  The Act further explained that the rules must be proposed by January 1, 2022, with a final rule implemented "6 months after the date of the conclusion of the comment period" on the proposed rule.  To date, no proposed rule has been published in the Federal Register, and HHS has not implemented protections under the non-discrimination provision.

57.     Thus, HHS has also failed to comply with the No Surprises Act.  That has further allowed discrimination to continue despite Congress's doubling down on its efforts to compel HHS to implement the nondiscrimination provision.

### III.     Unlawful Discrimination Against CRNAs by Insurance Companies and Health Plans

58.     Despite longstanding reimbursement to CRNAs by both Medicare and insurance companies at 100 percent of the physician fee schedule, CRNAs now face discrimination based solely on their licensure—in direct contravention of the law.

59.     Cigna and Anthem Blue Cross Blue Shield are health insurance issuers licensed to engage in the business of insurance in multiple states around the country, including Ohio.

### a.  <u>Discrimination By Cigna</u>

60.     Cigna announced that effective March 12, 2023, it would begin reimbursing nonmedically directed anesthesia services performed by CRNAs (i.e. "QZ" services) at 85 percent of the Physician Fee Schedule.  https://www.aana.com/news/aana-issues-statement-on-cigna-reimbursement-policy/

14

61.     Plaintiff expressed concern to Cigna when it announced its policy, noting that the new policy would "devastate healthcare delivery" and that it would "encourage[] higher-cost healthcare delivery without improving quality, and impede[] access to healthcare for patients, especially in rural and underserved areas." *See id.*

62.     Plaintiff also explained that "CRNAs are the sole anesthesia providers in nearly 100 percent of rural hospitals. Rural areas depend disproportionately on CRNA services for anesthesia and pain management care, affording these medical facilities obstetrical, surgical, trauma stabilization, and pain management capabilities. Without CRNAs to administer anesthesia and pain management services in rural and underserved areas, where many of Cigna's members reside, patients would lose access to vital treatment, which could result in poor healthcare outcomes, lower quality of life, and unnecessary costs to patients." *Id.*

63.     Eventually, Cigna responded to the repeated voicing of concerns with a letter on August 6, 2024, to Dru Riddle, PhD, DNP, CRNA, FAAN, then the president of the AANA's Board of Directors.  *See* Ex. B.

64.     Cigna informed Dr. Riddle that its CRNA reimbursement policy would apply "when a CRNA (licensed nurse) does the anesthesia for a surgery alone, without the supervision of a physician.  The QZ modifier designates that circumstance."  *Id.*

65.     The decision, Cigna wrote, was "based on the fact that a licensed CRNA is licensed to practice as an advance-practice nurse while a licensed physician anesthesiologist is licensed to practice as a physician, graduates from medical school, and completes a residency program in anesthesiology." *Id.*

15

66.    Cigna summarized its justification that this practice is "consistent with its application of this same principle across other specialties where a non-physician practitioner of **lesser training and licensure** is providing services." *Id.* (emphasis added).

67.    Cigna did not explain this distinction. More importantly and as explained above, they cannot. There is no evidence available to Cigna, to Anthem, or to anyone else to demonstrate that the educational differences between physician anesthesia providers and CRNAs have anything to do with the safe administration of anesthesia or yields any difference in "quality or performance" as the statute might allow.  42 U.S.C. 300gg-5(a).

68.    Cigna's position certainly cannot be reconciled with the ACA's requirements that insurer cannot discriminate against a provider "acting within the scope of that provider's license or certification under applicable State law."  42 U.S.C. § 300gg-5(a).

69.    Cigna's rationale is nothing more than a pretextual effort to justify discrimination based upon the CRNA license.  The educational differences, often touted by physician anesthesia providers, do not relate to the administration of anesthesia—the service for which reimbursement is being sought.  In many of the accredited anesthesia programs throughout this country, physician anesthesia residents and nurse anesthesia students are being educated—side by side—with regards to the safe administration of anesthesia.

70.    The claim that CRNAs are "of *lesser training and licensure*" reflects, at best, an outdated preference for organized medicine over professional nursing and, at worst, is indicative of an offensive foundation of misogyny that presumes professional nursing is lesser.

71.    Cigna did not and cannot explain how its claimed difference in "training and licensure" complied with the ACA's direct prohibition on discrimination against a provider acting

16

within the scope of their license.  Nor did Cigna claim that CRNAs perform at a lower quality, as the ACA would require.

72.     In short, the Cigna policy flatly discriminates against CRNAs for no reason other than the fact that CRNAs did not go to medical school.  That, however, does reflect the standard of care CRNAs perform when administering anesthesia, which, by all accounts, is the same as services offered by physician anesthetists.

73.     Cigna's policy violates 42 U.S.C. § 300gg-5(a)'s nondiscrimination prohibition.

### b. <u>Discrimination By Anthem</u>

74.     Anthem has also announced similar cuts to CRNA reimbursement.

75.     On June 12, 2024, Anthem approved a policy change that updated its reimbursement policy for modifier QZ that mirrored Cigna's approach. The Anthem plan also reduced QZ reimbursement from 100 percent to 85 percent.  *See* Ex. A.

76.     On August 1, 2024, Anthem issued a Policy Update again reiterating that the modifier QZ reimbursement would go from 100 percent to 85 percent.  The changes are set to go into effect on November 1, 2024. Ex. C

77.     Anthem's policy change violates the ACA's nondiscrimination provision as it discriminates against CRNAs who are acting within the scope of their licensure.

78.     On August 13, 2024, fourteen professional organizations making up the Patient Access to Responsible Care Alliance ("PARCA") wrote to the Secretaries of HHS, Department of Labor, and Department of Labor to highlight the problem with insurers violating the nondiscrimination provision.  Ex. D.

79.     In particular, PARCA wrote to "again urge your agencies to promulgate rulemaking on" the nondiscrimination section.  PARCA explained that the "failure of the Administration to promulgate rulemaking continues to empower insurers to put profits ahead of patients and exacerbate financial problems for providers."

80.     PARCA further noted that without rulemaking "many non-MD/Do providers"—such as CRNAs—"continue to face undue barriers to providing care, based on discriminatory policies from insurers."

81.     PARCA's letter is simply the latest statement emphasizing that insurers have long engaged in discrimination against non-physicians such as CRNAs.  As the American Bar Association recognized earlier this year, "insurance companies and plans . . . continue to discriminate on providers practicing within the full scope of practice but licensed as a nurse vs. physician anesthesiologist or nurse practitioner vs physician primary care provider." https://www.americanbar.org/groups/health_law/section-news/2024/march/opinion-provider-non-discrimination-law-continues-to-be-violated-by-insurance-companies/, Ex E.  In particular, the ABA noted that Cigna's decision to reduce reimbursement for the QZ modifier had "no sound basis, particularly in light of the recent shift toward quality and performance-based reimbursement."

82.     As of the filing of this complaint, no substantive response has been received nor have any rules been implemented.

83.      Despite this well-known and openly publicized discrimination, HHS has not once enforced the ACA's ban on nondiscrimination.

84.     Upon information and belief, other industries experiencing varying levels of discriminatory conduct rooted solely in being non-physician providers have presented similar complaints to HHS.

85.     The government, including HHS and Secretary Becerra, are aware of the ongoing discrimination against CRNAs.

86.     No state has enforced the nondiscrimination provision of the ACA based on the QZ modifier changes implemented and proposed by insurers.  HHS and its Secretary are aware that no State has enforced the ACA's nondiscrimination provision.

87.     Because HHS knows states have "failed to substantially enforce a provision" of the law, HHS is duty bound to enforce the law.  42 U.S.C. § 300gg-22(a)(2).

88.     Just as Anthem followed Cigna, additional insurance providers will begin reducing payments to CRNAs and, absent intervention, the reimbursement cuts will not stop at 85%. Without anyone willing to enforce the provider nondiscrimination provisions and without any private right of action there is, literally, nothing to stop further discrimination.

## IV.     HHS Has Abdicated its Clear Duty to Enforce the Law, Resulting in Harm to Plaintiff's Members Who Have No Other Available Remedy

89.     HHS has a clear duty to enforce the law.  Here, that includes investigating whether the States have enforced the nondiscrimination provision and, if not, bringing its own enforcement action.  42 U.S.C. § 300gg-22.

90.     HHS has refused to do so, even though insurers repeatedly engage in open and blatant discrimination.  Moreover, HHS is well aware of the ongoing discrimination and knows that States are not enforcing the law.

91.     In fact, HHS itself has never enforced the nondiscrimination provision.

19

92.     As an executive agency of the United States, HHS has a constitutional duty to enforce the law.  *United States v. Arthrex, Inc.*, 594 U.S. 1, 6 (2021) ("Under the Constitution, '[t]he executive Power,' is vested in the President, who has the responsibility to 'take Care that the Laws be faithfully executed.'" (quoting U.S. CONST. Art. II, § 1, cl. 1; § 3)); *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (executive agencies "must follow statutory mandates so long as there is appropriated money available, and the President has no constitutional objection to the statute." (emphasis omitted)).

93.     Section 300gg-22 of Title 42 *requires* HHS to enforce the nondiscrimination provision because "the statute uses the typically mandatory 'shall'" language.  *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 190 (D.C. Cir. 2016); 42 U.S.C. § 300gg-22.

94.     Plaintiff's members have a clear right to the requested relief.  The ACA is *explicit* that providers cannot be discriminated against based upon their licensure.  No supportable rationale could justify differing reimbursement rates between CRNAs and physician anesthesia providers other than licensure.  Indeed, Cigna *specifically cited* licensure as the reason for its change in policy. *See* Ex. B.

95.     CRNA's have a right to equal treatment in reimbursement for anesthesia administration.  The insurers' new policies altered that and thus violated the law.

96.     HHS's failure to enforce the nondiscrimination provision has harmed Plaintiff's members by permitting insurers to pay CRNAs in Ohio—and around the country—less than they otherwise would receive for the same treatment provided.

97.     This reimbursement policy hurts not only CRNAs.  It also affects thousands of patients and communities in need of care from CRNAs.

98.     Indeed, CRNAs have no other option to challenge the discriminatory policy at issue here.  The ACA provides no private right of action, so CRNAs and Plaintiff cannot bring suit to stop the insurers' new reimbursement policies, even though they clearly violate the law.  *Presque Isle Colon and Rectal Surgery v. Highmark Health*, 391 F. Supp. 3d 485, 512 (W.D. Pa. 2019) ("the ACA expressly provides that only the States and secondarily the Secretary of the Department of Health and Human Services may enforce the antidiscrimination provision. 42 U.S.C. § 300gg-22. It is therefore not silent on the issue of enforcement, it determines precisely who may and may not sue to enforce its provisions."); *Smith v. United Healthcare Ins. Co.*, 2019 WL 3238918, at *6 (N.D. Cal. July 18, 2019) (noting that "enforcement authority is vested with the Secretary of Health and Human Services."); *Grossman v. Directors Guild of Am. Inc.* 2017 WL 5665024, at *7 (C.D. Cal. Mar. 6, 2017) (ACA "contains an enforcement provision limited to the states and the Secretary of Health and Human Services."); *Mills v. Bluecross Blueshield of Tenn., Inc*., No. 3:15-cv-552-PLR-HBG, 2017 WL 78488, at *6 (E.D. Tenn. Jan. 9, 2017) (ACA "expressly left enforcement of" 300gg-5 "to the states and the Secretary of Health and Human Services, not individuals.").

99.     Only the government may require that Cigna, Anthem, and other insurers and health plans comply with 42 U.S.C. § 300gg-5.

100.     Thus, no other adequate remedy is available to Plaintiff and its members.

**COUNT I**
**Relief under the Mandamus Act (28 U.S.C. § 1361)**

101.     Plaintiff realleges and incorporates all allegations in paragraph 1-100 above as if fully set forth herein.

102.     The Mandamus Act vests district courts with jurisdiction over actions to compel officers of the United States or any agency thereof to perform a duty owed to Plaintiff.

103.   Secretary Becerra is an officer of the United States.

104.   HHS is an agency of the United States.

105.   HHS has a clear, undeniable, non-discretionary duty to enforce the ACA's nondiscrimination provision.  Indeed, the law requires that HHS "*shall* enforce" the law.  42 U.S.C. 300gg-22(a).

106.   There is no difference in quality of care or performance between CRNA's and physician anesthesia providers acting within the scope of their licensure.  Claimed differences in education that do not relate to the safe administration of anesthesia do not have any effect on patient outcomes, patient safety, or the quality of care being provided by both CRNAs and physicians.

107.   Insurance companies, including Cigna and Anthem, have discriminated against CRNAs acting within the scope of their licensure by reimbursing them less than physician anesthesia providers.

108.   HHS and Secretary Becerra have never enforced the ACA's ban on provider discrimination, despite the well-known discrimination against CRNAs and other providers.

109.   HHS and Secretary Becerra have never investigated discrimination against CRNAs under the ACA.

110.   HHS's delays in investigating and enforcing the law plainly violate the ACA.

111.   Thus, HHS has abdicated its constitutional duty to enforce the law by permitting insurance companies to flout the ACA and Congress's clear intent in passing the nondiscrimination provision.

112.    HHS's actions threaten the livelihood of CRNAs, patient safety, and healthcare access to millions of people around the country, particularly in underserved communities.

113.    Absent mandamus, Plaintiff has no adequate remedy.  No provision of law provides for a private cause of action to enforce the nondiscrimination statute.  Without enforcement by HHS, Plaintiff will be forced to endure unfettered discrimination at the hands of insurers in plain violation of the law.

**COUNT II**
**Relief under the Administrative Procedure Act (5 U.S.C. § 706)**

114.    Plaintiff realleges and incorporates all allegations in paragraph 1-113 above as if fully set forth herein.

115.    The Administrative Procedure Act requires that agencies perform required actions "within a reasonable time."  5 U.S.C. § 555(b).

116.    The definition of "agency action" includes the "failure to act." 5 U.S.C. § 551(13).

117.    Final agency action includes an agency's failure to act within a reasonable time.

118.    Under the APA, courts may "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

119.    The APA thus requires agencies to act when Congress has instructed them to do so.

120.    Even when a statute contains no written deadline by which to act, agencies must take action within a reasonable time.

121.    HHS is an "agency" under the APA.

122.    There is no difference in quality of care or performance between CRNA's and physician anesthesia providers acting within the scope of their licensure.  Claimed differences in education that do not relate to the safe administration of anesthesia do not have any effect on

23

patient outcomes, patient safety, or the quality of care being provided by both CRNAs *and* physicians.

123.    Insurance companies, including Cigna and Anthem, have discriminated (or announced their intention to discriminate) against CRNAs acting within the scope of their licensure by reimbursing them less than physician anesthesia providers.

124.    HHS has never enforced the nondiscrimination provision even though it is aware of discrimination.

125.    The nondiscrimination provision was enacted 14 years ago and has never been enforced.

126.    Reiterating the importance of implementing the provider nondiscrimination provision, Congress required rules to be proposed by January 1, 2022, and a final rule to be implemented six months after the comment period commenced.  No such rules have been promulgated.  No Surprises Act, Public Law 116-260, 134 Stat. 1182, Division BB, § 109.

127.    AANA and other organizations have alerted HHS of the ongoing discrimination against CRNAs, most recently by Cigna and Anthem, by reducing the modifier QZ reimbursement policy.

128.    HHS has a constitutional duty to faithfully enforce the law.  It has failed to do so.

129.    Enforcement of the nondiscrimination law is not committed to agency discretion by law.  HHS must enforce the law.

130.    HHS has engaged in an unreasonable delay in enforcing the ACA, resulting in harm to CRNAs, patients, and the healthcare industry by, among other things, threatening patient outcomes and blocking access to care.

24

131.    HHS's failure to comply with its obligations to enforce the law constitutes agency action "unreasonably delayed" and/or "unlawfully withheld."

132.    Absent relief, Plaintiff and its members will continue to face blatant discrimination.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for the following relief:

a.    A declaration, order, and judgment holding that reduced reimbursement for anesthesia procedures administered with the QZ modifier violates the nondiscrimination provision of the ACA. 42 U.S.C. §§ 300gg-5, 300gg-22.

b.    A declaration, order, and judgment, holding that Defendants have a duty to enforce the nondiscrimination provision of the ACA. 42 U.S.C. §§ 300gg-5, 300gg-22.

c.    An order requiring HHS:

(i)    comply with its statutory obligations to enforce the nondiscrimination provision of the ACA. 42 U.S.C. §§ 300gg-5, 300gg-22; and,

(ii)    report back to the Court within 90 days regarding the steps it has taken to enforce these provisions.

d.    An order pursuant to 28 U.S.C. § 2412 for recovery of costs and reasonable attorney's fees.

e.    An order maintaining jurisdiction over this matter until further order of the Court.

f.    Any other relief as this court deems appropriate.

Dated: September 27, 2024.                    Respectfully Submitted,


AMERICAN ASSOCIATION OF NURSE ANESTHESIOLOGY

By: */s/ Mark J. Silberman*

By:

25

Mark J. Silberman
General Counsel (outside) for AANA
MSilberman@Beneschlaw.com
BENESCH FRIEDLANDER COPLAN &
ARONOFF
71 S. Wacker Drive, Suite 1600
Chicago, Illinois 60606
Telephone: 312-212-4952
FULL ADMISSION PENDING


By: */s/ Chris Grohman*
Christopher T. Grohman
cgrohman@beneschlaw.com
BENESCH FRIEDLANDER COPLAN &
ARONOFF
71 S. Wacker Drive, Suite 1600
Chicago, Illinois 60606
Telephone: 312-212-4949

John Kerkhoff
jkerkhoff@beneschlaw.com
BENESCH FRIEDLANDER COPLAN &
ARONOFF
41 S. High Street, Suite 2600
Columbus, Ohio 43215
Telephone: 614-223-9300

*Attorneys for Plaintiff*