## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **AMERICAN ASSOCIATION OF NURSE ANESTHESIOLOGY,** | **Case No.  1:24-CV-1657** |
| **Plaintiff,** | **JUDGE PAMELA A. BARKER** |
| **-vs-** | |
| **ROBERT F. KENNEDY, JR., SECRETARY OF THE UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,** | **MEMORANDUM OPINION & ORDER** |
| **Defendants** | |

Pending before this Court is the Motion to Dismiss of Robert F. Kennedy, Secretary of Health and Human Services (the "Secretary") and the United States Department of Health and Human Services (together, "Defendants")[1] ("Defendants' Motion"), filed on December 26, 2024.  (Doc. No. 11.)  On January 27, 2025, Plaintiff American Association of Nurse Anesthesiology ("Plaintiff" or "AANA") filed a Brief in Opposition to Defendants' Motion ("AANA's Opposition").  (Doc. No. 13.)  On February 24, 2025, Defendants filed a Reply in Support of Defendants' Motion ("Defendants' Reply").  (Doc. No. 17.)

Also pending before this Court is the Motion for Leave to File Amicus Curiae Brief of the American Society of Anesthesiologists In Support of Dismissal ("ASA's Motion") (Doc. No. 15), filed

---

[1] Secretary Kennedy is substituted for Secretary Becerra as the named Defendant in this action.  Under Fed. R. Civ. P. 25(d), when a public officer who is a party in an official capacity ceases to hold office while the action is pending, "the officer's successor is automatically substituted as a party."  Fed. R. Civ. P. 25(d).

on February 10, 2025, and the Motion for Leave to File Addendum to AANA's Opposition, *Instanter*

("AANA's Motion for Leave"), filed on August 13, 2025.  (Doc. No. 22.)

For the following reasons, Defendants' Motion is GRANTED (Doc. No. 11), and ASA's

Motion (Doc. No. 15) and AANA's Motion for Leave (Doc. No. 22) are DENIED as moot.

## I.     Background

### A.     Plaintiff's Allegations

AANA is a "professional association for nurse anesthesia providers" and certified registered

nurse anesthetists ("CRNAs") "compris[ed] of more than 65,000 members across the United States."

(Doc. No. 1 at PageID# 4.)

AANA alleges that "CRNAs provide quality anesthesia services equivalent to those performed

by physician anesthesia providers, albeit, CRNAs actually administer the majority of anesthesia in the

United States."  (*Id.* at PageID# 2.)  "CRNAs are trained, credentialed, and licensed independent

practitioners whose scope of practice enables them to administer anesthesia to all types of patients, for

all types of procedures, in every setting in which anesthesia is administered."  (*Id.*)  Both they and

physician anesthesia providers (e.g., anesthesiologists) "administer the same procedures utilizing the

same equipment with the same focus on patient care and producing the same quality outcomes."  (*Id.*)

AANA alleges that "CRNAs and physician anesthesia providers do the same thing at the same

level, and they adhere to the same standards."  (*Id.* at PageID# 8.)  In support, AANA contends that

"[s]ometimes, CRNAs, physician anesthesia providers, and other professionals work collaboratively

to deliver anesthesia to patients" and at "[o]ther times, CRNAs will administer anesthesia under the

'medical direction' of a physician anesthesia provider[.]" (*Id.* at PageID# 7.)  However, the

"[e]ducational differences between physicians and nurses play no role in and are entirely unrelated to

2

the safe and effective administration of anesthesia[,]" and "[p]atient outcomes are unaffected by whether a CRNA or physician administers the anesthesia independently or whether the anesthesia is administered utilizing an oversight or collaborative model." (*Id.* at PageID# 7.)

AANA alleges that Cigna (together with Anthem, the "Insurers") "arbitrarily cut CRNA reimbursement rates" after deciding "that CRNAs are worthy of less reimbursement than their physician counterparts, despite providing the same care to patients, with the same outcome, utilizing the same equipment, and employing the same processes." (*Id.* at PageID#s 3-4.)  Specifically, "Cigna announced that effective March 12, 2023, it would begin reimbursing nonmedically directed anesthesia services performed by CRNAs . . . at 85% of the Physician Fee Schedule." (*Id.* at PageID# 14.)  And "[o]n June 12, 2024, Anthem approved a policy change that updated its reimbursement policy . . . that mirrored Cigna's approach." [2]  (*Id.* at PageID# 17.)  AANA predicts that "others will follow suit." (*Id.* at PageID#s 3-4.)[3]

According to AANA, the Insurers' Reimbursement Policy "flatly discriminates against CRNAs for no reason other than the fact that CRNAs did not go to medical school." (*Id.* at PageID#s 17, 19.)

---

[2] Hereinafter, the Court uses the term "Reimbursement Policy" to refer to Cigna's and Anthem's policy of "reduced reimbursement for anesthesia procedures with the QZ modifier," i.e., the policy  of reimbursing healthcare providers for anesthesia services administered by CRNAs *without* 'Medical Direction' at only 85% of the rate at which they reimburse such providers for anesthesia administered by CRNAs *under* 'Medical Direction' or by a physician anesthesia provider. (Doc. No. 1 at PageID#s 10-11, 25)

[3] In its Addendum to its Motion for Leave, AANA contends that another insurer, UnitedHealthcare, has since adopted the same policy.  (Doc. No. 21 at PageID# 264.)

3

**B.      Relevant Statutory and Enforcement Background**

When Congress enacted the Patient Protection and Affordable Care Act ("ACA") in 2010, it

modified the Public Health Service Act ("PHS Act") of 1944 by adding Section 2706, titled "Non-

discrimination in health care," which provides as follows:

> Providers.  A group health plan and a health insurance issuer offering group or
> individual health insurance coverage shall not discriminate with respect to participation
> under the plan or coverage against any health care provider who is acting within the
> scope of that provider's license or certification under applicable State law.  This section
> shall not require that a group health plan or health insurance issuer contract with any
> health care provider willing to abide by the terms and conditions for participation
> established by the plan or issuer.  Nothing in this section shall be construed as
> preventing a group health plan, a health insurance issuer, or the Secretary from
> establishing varying reimbursement rates based on quality or performance measures.

42 U.S.C. § 300gg-5(a) (the "ACA Nondiscrimination Provision").  The ACA Nondiscrimination

Provision does not create a private cause of action for healthcare providers to sue health insurance

providers who discriminate against them.[4]  Rather, the Secretary and the states share enforcement

authority:

> Failure to implement provisions.  In the case of a determination by the Secretary that a
> State has failed to substantially enforce a provision (or provisions) in this part or part
> D with respect to health insurance issuers in the State, the Secretary shall enforce such
> provision (or provisions) under subsection (b) insofar as they relate to the issuance,
> sale, renewal, and offering of health insurance coverage in connection with group
> health plans or individual health insurance coverage in such State.

42 U.S.C. § 300gg-22(a)(2).[5]   The Secretary has delegated enforcement of the ACA

Nondiscrimination Provision to a sub-agency of HHS, the "Centers for Medicare & Medicaid

---

[4] *See, e.g.*, *Presque Isle Colon & Rectal Surgery v. Highmark Health*, 391 F. Supp. 3d 485, 512 (W.D. Pa. 2019) (citing
*A.Z. by & through E.Z. v. Regence Blueshield*, 333 F. Supp. 3d 1069, 1082–83 (W.D. Wash. 2018)) ("There is fair
consensus that the ACA's Nondiscrimination provision, 42 U.S.C. § 300gg-5, does not create a private right of action.")
(collecting cases).

[5] Defendants interchangeably refer to 42 U.S.C. § 300gg-22 as Section 2723 of the PHS Act.  (Doc. No. 11-1 at PageID#
91).  For clarity, the Court refers to the ACA's enforcement mechanism thereunder as § 300gg-22(a)(2).

4

Services" ("CMS") (Doc. No. 11-1 at PageID#s 91-92), which has promulgated the following regulation outlining its enforcement process:

> CMS enforces PHS Act requirements to the extent warranted (as determined by CMS) in any of the following circumstances:
>
> (a) Notification by State. A State notifies CMS that it has not enacted legislation to enforce or that it is not otherwise enforcing PHS Act requirements.
>
> (b) Determination by CMS. If CMS receives or obtains information that a State may not be substantially enforcing PHS Act requirements, it may initiate the process described in this subchapter to determine whether the State is failing to substantially enforce these requirements.

45 C.F.R. § 150.203. Violators of the ACA Nondiscrimination Provision (or any PHS Act requirement) are subject to civil monetary penalties. *See* 42 U.S.C. § 300gg-22(b)(2)(A); 45 C.F.R. § 150.301.

Citing the ACA Nondiscrimination Provision, AANA contends that "[t]he ACA does not permit such discrimination [against CRNAs] based solely on licensure." (*Id.* at PageID# 11.) According to AANA, "for more than a decade, HHS has *never* enforced [the ACA Nondiscrimination Provision] nor even attempted to ascertain whether States have enforced the law. Indeed, despite this clear statutory mandate, neither the States, nor HHS has brought *any* action to enforce the law." (*Id.* at PageID# 13.)

### C. Procedural History

On September 27, 2024, AANA filed the Complaint in this Court. (Doc. No. 1.) Therein, AANA asserts two claims against Defendants: (1) Count I: Relief under the Mandamus Act, 28 U.S.C. § 1361; and (2) Count II: Relief under the Administrative Procedure Act, 5 U.S.C. § 706. (*Id.* at PageID#s 21-25.) AANA includes the following in its Prayer for Relief:

    a.    A declaration, order, and judgment holding that reduced reimbursement for anesthesia procedures administered with the QZ modifier violates the nondiscrimination provision of the ACA. 42 U.S.C. §§ 300gg-5, 300gg-22.

    b.    A declaration, order, and judgment, holding that Defendants have a duty to enforce the nondiscrimination provision of the ACA. 42 U.S.C. §§ 300gg-5, 300gg-22.

    c.    An order requiring HHS:

        (i)  comply with its statutory obligations to enforce the nondiscrimination provision of the ACA. 42 U.S.C. §§ 300gg-5, 300gg-22; and,

        (ii) report back to the Court within 90 days regarding the steps it has taken to enforce these provisions.

    d.    An order pursuant to 28 U.S.C. § 2412 for recovery of costs and reasonable attorney's fees.

    e.    An order maintaining jurisdiction over this matter until further order of the Court.

    f.    Any other relief as this court deems appropriate.[6]

(*Id.* at PageID# 25.) On December 26, 2024, Defendants filed their Motion, and on January 27, 2025, AANA filed its Opposition. (Doc. Nos. 11, 13.) On February 24, 2025, Defendants filed their Reply. (Doc. No. 17.)

Additionally, on February 10, 2025, ASA filed its Motion, and on August 13, 2025, AANA filed its Motion for Leave. (Doc. Nos. 15, 22.)

---

[6] AANA also alleges that the Secretary has failed to comply with the No Surprises Act, which provides that "Not later than January 1, 2022, the Secretary of Health and Human Services, the Secretary of Labor, and the Secretary of the Treasury shall issue a proposed rule implementing the protections of section 2706(a) of the Public Health Service Act." No Surprises Act, Pub. L. No. 116-260, 134 Stat. 1182, 2859 (2020). (Doc. No. 1 at PageID#s 13-14.) However, AANA does not request relief from the Court mandating that the Secretary issue such a proposed rule, but only that the HHS "comply with its statutory obligations to enforce the nondiscrimination provision of the ACA [under] 42 U.S.C. §§ 300gg-5, 300gg-22." (*Id.* at PageID# 25 [Prayer for Relief].)

## II.     Standard of Review

Defendants move to dismiss AANA's Complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. No. 11-1 at PageID#s 88-89.)  However, this "Court must first determine whether it has subject matter jurisdiction under Rule 12(b)(1), since a lack of subject matter jurisdiction renders Defendants' Rule 12(b)(6) motions moot."  *Kissinger v. Mahoning Cnty. Republican Party*, 677 F. Supp. 3d 716, 723 (N.D. Ohio 2023) (citing *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990)).

The standard of review of a 12(b)(1) motion to dismiss for lack of subject matter jurisdiction depends on whether the defendant makes a facial or factual challenge to subject matter jurisdiction. *Wayside Church v. Van Buren County*, 847 F.3d 812, 816-17 (6th Cir. 2017).  A facial attack "questions merely the sufficiency of the pleading" and requires the district court to "take[] the allegations in the complaint as true."  *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007).  To survive a facial attack, the complaint must contain a short and plain statement of the grounds for jurisdiction.  *See Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 387 (6th Cir. 2016); *Ogle v. Ohio Civil Service Employees Ass'n, AFSCME, Local 11*, 397 F. Supp. 3d 1076, 1081-82 (S.D. Ohio 2019).  By contrast, a factual attack "raises a factual controversy requiring the district court 'to weigh the conflicting evidence to arrive at the factual predicate that subject-matter does or does not exist.'" *Wayside Church*, 847 F.3d at 817 (quoting *Gentek Bldg. Prods., Inc.*, 491 F.3d at 330).  The plaintiff has the burden of proving jurisdiction when subject matter jurisdiction is challenged.  *Rogers v. Stratton Indus.*, 798 F.2d 913, 915 (6th Cir. 1986).  The court may allow

7

"affidavits, documents and even a limited evidentiary hearing to resolve disputed jurisdictional facts."

*Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

## III.    Analysis

### A.    Associational Standing

"Article III of the Constitution limits the judicial power of the United States to the resolution of 'Cases' and 'Controversies.'"  *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 597-98 (2007) (alteration in original) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342, (2006)). The case-or-controversy requirement is satisfied only where a plaintiff has standing.  *See Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 273 (2008).  As the party invoking federal jurisdiction, the plaintiff bears the burden of establishing standing.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  "Whether a plaintiff has standing to sue is 'determined as of the time the complaint is filed.'"  *Sullivan v. Benningfield*, 920 F.3d 401, 407 (6th Cir. 2019) (quoting *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 524 (6th Cir. 2001)).

AANA is an association that represents CRNAs.  Associational standing, a form of representational standing,[7] "permits an entity to sue over injuries suffered by its members[.]"  *Ass'n of Am. Physicians & Surgs v. United States FDA*, 13 F.4th 531, 537 (6th Cir. 2021).  An association may sue on behalf of its members if it satisfies three requirements.  First, "its members would otherwise

---

[7] Courts use the term "associational standing" and "representative" or "representational" standing interchangeably.  *See, e.g.*, *Children's Health Def. v. United States Food & Drug Admin.*, 2022 WL 2704554 at *2 (6th Cir. July 12, 2022) ("[A]n organization can satisfy Article III's standing requirements . . . by suing on behalf of its members, called 'associational' or 'representative' standing.");  *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 778 F. Supp. 3d 685, 720 (D. Md. 2025) (citations omitted) ("[A]n association may have standing solely as the representative of its members . . . this is often called 'associational' standing, which is a type of representational standing.");  *New York Communities for Change v. New York City Dep't of Educ.*, 2013 WL 1232244 at *7 (E.D.N.Y. Mar. 26, 2013) ("This type of standing is referred to as 'associational standing' or 'representational standing.'").

have standing to sue in their own right;" second, "the interests it seeks to protect are germane to the organization's purpose;" and third, "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Dayton Area Chamber of Commerce v. Kennedy*, 2025 WL 2237556 at *4 (6th Cir. Aug. 6, 2025) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

AANA argues that it satisfies the second and third requirements above (i.e., the interests it seeks to protect are "germane to the organization's purpose," and "individual members' participation" is unnecessary) because its mission is "to advance, support and protect nurse anesthesiology and its CRNA and RRNA members," and because it "does not seek financial recovery on behalf of its effected members." (Doc. No. 13 at PageID# 118) (citing *Friends of the Earth, Inc., v. Laidlaw Env't Servs.*, 528 U.S. 167, 181 (2000) (citing *Hunt*, 432 U.S. at 342)). However, Defendants do not contest AANA's ability to satisfy the second and third requirements of *Hunt*'s associational standing test, so the Court need only determine whether one of the association's members has standing in his or her own right. *See* 432 U.S. at 343.

"Standing consists of three elements: (1) an injury in fact that is (2) fairly traceable to the defendant's challenged conduct, and (3) likely to be redressed by a favorable judicial decision." *Burt v. Playtika, Ltd.*, 132 F.4th 398, 403 (6th Cir. 2025) (citing *Spokeo*, 578 U.S. at 338). In other words, "[w]ithout the plaintiff suffering an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Id.* (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)). The Court addresses each element in turn.

9

### 1. Injury-in-Fact

Defendants argue that AANA has not met the 'injury-in-fact' requirement because the Complaint fails to identify a *particular* member who was paid at a lower rate by the Insurers.  (Doc. No. 11-1 at PageID# 94.)   In its Opposition—but not its Complaint—AANA includes several affidavits of CRNA members who aver that they have been financially harmed by the Reimbursement Policy.  (Doc. No. 13 at PageID#s 116-17; Affidavit of Kim Riviello, Doc No. 13-1 at PageID#s 134-35; Affidavit of Brian Cross, Doc. No. 13-2 at PageID#s 138-39; Affidavit of Christopher Buehrer, Doc. No. 13-3 at PageID#s 142-43.)

An association can show an injury-in fact when it can "'identify a member who has suffered (or is about to suffer) a concrete and particularized injury from the defendant's conduct[.]'"  *Weiser v. Benson*, 48 F.4th 617, 624 n.4 (6th Cir. 2022) (quoting *Ass'n of Am. Physicians & Surgs*, 13 F.4th at 543-44).  And "[i]n the context of claims for injunctive or declaratory relief, the threatened injury in fact must be 'concrete and particularized,' as well as 'actual and imminent, not conjectural or hypothetical.'"  *Sullivan v. Benningfield*, 920 F.3d 401, 407-08 (6th Cir. 2019) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009)).  "A 'concrete' injury must be 'de facto'; that is—it must actually exist."  *Spokeo*, 136 S. Ct. at 1548.  "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'"  *Id.* (quoting *Lujan*, 504 U.S. at 561 n.1).  However, "[p]hysical injury and monetary loss easily satisfy the injury-in-fact requirement." *Salazar v. Paramount Glob.*, 133 F.4th 642, 647 (6th Cir. 2025) (citing *TransUnion, LLC v. Ramirez*, 594 U.S. 413, 425 (2021)).

Apparently, AANA realized that its Complaint failed to identify one of its members who suffered an injury-in-fact because it included the affidavits in its Opposition.  (Doc. No. 13 at PageID#s

10

116-17.)  Yet AANA chose not to amend its Complaint in response to Defendants' Motion, even though AANA had the right to do so "as a matter of course" within twenty-one (21) days after Defendants served their Motion on AANA.  *See* Fed. R. Civ. P. 15(a)(1)(B).  AANA also could have moved to amend at any point during the last nine (9) months by asking for (and receiving) the Court's leave under the liberal amendment standards.  *See* Fed. R. Civ. P. 15(a)(2).  Instead, it chose neither option; it only attached the affidavits to its *Opposition*.  But an affidavit attached to an opposition brief is not the proper procedural vehicle to add essential allegations.  Indeed, it is well-established that "[a]n affidavit submitted in opposition to a dispositive motion is not a substitute for an amended pleading."  *Garcar v. City of Youngstown*, 2019 WL 13261472 at *2 (N.D. Ohio July 8, 2019); *see also Kelly v. Valeo N. Am., Inc.*, 2025 WL 933943 at *5 (E.D. Mich. Mar. 27, 2025) (quoting *Becton v. Corrs. Corp. of Am.*, 2017 WL 1461632 at *2 (M.D. Tenn. Mar. 28, 2017)) ("[A] plaintiff may not amend his complaint by adding factual allegations as a part of a response in opposition to a motion to dismiss."); *Mohamed v. Bank of Am., N.A.*, 771 F. Supp. 3d 695, 708 n.5 (D. Md. 2025) ("[A] memorandum in opposition to a motion is not a proper vehicle for amending a complaint or adding new claims.")  (citations omitted).

Accordingly, because AANA's *Complaint* is devoid of allegations identifying a particular CRNA injured by the Secretary, the Court concludes that AANA has not properly pled an injury-in-fact.

### 2.  Causation

Even if the affidavits AANA attached to its Opposition were properly included in an amended complaint, and even assuming AANA's proffered interpretation of the ACA Nondiscrimination

11

Provision (42 U.S.C. § 300gg-5(a)) is valid, the Court agrees with Defendants that AANA lacks standing because it cannot establish causation or redressability.

Citing *Turaani v. Wray*, 988 F.3d 313 (6th Cir. 2021) (Sutton, J.), Defendants argue that AANA has failed to establish the requisite causal connection between the Secretary's conduct and the CRNAs' alleged injuries because their injuries resulted from "the independent action of private third parties who are not before the court." (Doc. No. 11-1 at PageID# 94.) AANA, according to Defendants, needed to show that the Secretary's "actions had a 'determinative or coercive effect' upon the insurance companies[,]" but AANA only alleges that the Secretary's lack of enforcement "emboldened" the Insurers. (*Id.* at PageID# 94-95) (citing *Turaani*, 988 F.3d at 316). And Defendants further point out that the states, rather than the Secretary, "are generally the primary enforcer with respect to health insurance issuers." (*Id.* at PageID# 95.)

In its Opposition, AANA challenges what it describes as Defendants' "myopic" position that causation cannot flow through 'independent third parties.' (Doc. No. 13 at PageID#s 118-19.) AANA traces the chain of causation from the Secretary's inaction to its members' alleged injuries in two ways. First,

> [i]f HHS were to take the necessary steps to enforce Section 2706 of the ACA – such as impose fines for noncompliance, revoke insurance permits, or a myriad of other potential sanctions that are left to the discretion of the Secretary – then it is much less likely that the insurance companies would discriminate against the CRNAs by paying them less, thus redressing their grievances.

(*Id.* at PageID# 120.) Second, AANA argues that "the inverse is equally true":

> After 14 years of inaction, private insurers are sufficiently emboldened to modify the established reimbursement for services for which physician and nurse anesthesia providers have been equally reimbursed – by reducing the reimbursement for nurses – solely because they are nurses – in direct contravention of this law[.]"

(*Id.*) AANA's core contention is that if "the Court compel[s] the Secretary to act, ***any*** enforcement of the law will deter the insurance companies from continuing to violate it, inuring to the benefit of AANA's members." (*Id.* at PageID# 121) (emphasis added). In support of that theory of causation, AANA cites *National Nat'l Res. Defense Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95 (2d Cir. 2018) ("*NRDC*") and *Fed. Elections Comm'n v. Akins*, 524 U.S. 11 (1998). Lastly, in response to Defendants' contention that states are the primary enforcers of the ACA Nondiscrimination Provision, AANA notes that "it is the Secretary of HHS, and not the States, who holds the ultimate enforcement responsibility when Section 2706 is violated and nothing has been done to enforce it." (*Id.* at PageID#s 122-23.) In their Reply, Defendants note that AANA's theory of causation is more attenuated that the plaintiffs' in *NRDC* and that *Akins* is procedurally distinguishable. (Doc. No. 17 at PageID#s 192-94.)

"Causation is 'a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant.'" *Nader v. Blackwell*, 545 F.3d 459, 471 (6th Cir. 2008) (quoting *Steel Co. v. Citizens For a Better Env't*, 523 US. 83, 103 (1998)). When the "'causal relation between the claimed injury and the challenged action depends upon the decision of an independent third party[,] standing is not precluded, but it is ordinarily substantially more difficult to establish." *Ohio Stands Up! v. U.S. Dep't of Health & Hum. Servs.*, 2022 WL 1576929 at *2 (6th Cir. May 19, 2022) (quoting *California v. Texas*, 593 U.S. 659, 675 (2021)) (alterations omitted). "This element is frequently at issue when a plaintiff challenges a law by suing an official who may or may not have the authority to enforce it." *Moravec v. Beshear*, 2023 WL 6133134 at *2 (E.D. Ky. Sept. 19, 2023) (citing 13A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.5 (3d ed. 2023)).

The Supreme Court has recently reiterated the guidelines that frame a causation (and redressability) analysis where, as here, an unregulated plaintiff asserts standing based on the actions of a regulated third party.  "When the plaintiff is not the object of a government regulation[,] causation and redressability often depend on how regulated third parties not before the court will act in response to the government regulation or judicial relief."  *Diamond Alternative Energy, LLC v. EPA*, 145 S. Ct. 2121, 2135 (2025) (Kavanaugh, J.).  In such a scenario, "[c]ourts must distinguish the 'predictable' from the 'speculative' effects of government action or judicial relief on third parties."  *Id.* (quoting *Food and Drug Admin. v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024)).  The Court explained that "[w]ith respect to causation (and redressability), a court must conclude that third parties will likely react to the government regulation (or judicial relief) in predictable ways that will likely cause (or redress) the plaintiff's injury."  *Id.* (cleaned up).

Under the Sixth Circuit's precedent, "'an indirect theory of traceability requires that the government cajole, coerce, [or] command'" the third-party to cause the plaintiff's injury.  *Changizi v. Dep't of Health & Hum. Servs.*, 82 F.4th 492, 397 (6th Cir. 2023) (quoting *Turaani*, 988 F.3d at 316); *see also Wolf v. City of Detroit*, 2025 WL 2394871 at *8 (E.D. Mich. Aug. 18, 2025) (quoting *Turaani*, 988 F.3d at 316) ("[U]nless the defendant's actions had a 'determinative or coercive effect' upon the third party, the claimant's quarrel is with the third party, not the defendant."); *Ohio Stands Up! v. U.S. Dep't of Health & Hum. Servs.*, 564 F. Supp. 3d 605, 618-19 (N.D. Ohio 2021), *aff'd*, 2022 WL 1576929 (6th Cir. May 19, 2022) (same).

In *Turaani*, a man of Middle Eastern descent, Turaani, attempted to purchase a firearm from a firearms dealer.  *See* 988 F.3d at 315. The dealer ran Turaani's name through the FBI's national

14

background check system,[8] which returned a 'delay' response.  *See id.*  An FBI agent then visited the dealer's house, showed the dealer images of Turaani and another man of Middle Eastern descent, asked to view the information Turaani had provided the dealer, and left the dealer his contact information.  *See id.*  When Turaani later inquired with the dealer about the status of his purchase, the dealer informed Turaani that an FBI agent had visited the dealer's house, and that while the dealer could sell Turaani the firearm, "he was no longer comfortable doing so."  *Id.* (citations omitted).  Turaani then brought an APA claim against the Director of the FBI, but did not sue the dealer.[9]

The district court agreed that the dealer caused Turaani to suffer an injury-in-fact by violating his Second Amendment "right to purchase a firearm[.]"  *Turaani v. Wray*, 440 F. Supp. 3d 733, 737 (E.D. Mich. 2020), *aff'd*, 988 F.3d at 313 (6th Cir. 2021) (citing *Dist. of Columbia v. Heller*, 554 U.S. 570, 595 (2008)).  But the district court held that "Plaintiff has failed to establish traceability" because

> Plaintiff's essential argument is that Defendants' actions, by organizing and effectuating a background-check review process and their discussion with Plaintiff's commercial counterpart, ***brought about the seller's reluctance to sell Plaintiff a firearm.***  Thus, Plaintiff was allegedly denied the right to obtain a weapon.  What Plaintiff misses is any factual allegations tying a 'determinative and coercive' government action, approaching the force of law, to his inability to purchase a gun.

*Id.* at 738 (emphasis added).  On appeal, the Sixth Circuit agreed that Turaani lacked standing because he failed to trace his Second Amendment injury-in-fact to the FBI, reasoning as follows:

> Turaani's injury stems from the actions of the gun dealer, not the FBI.  Take stock of what the FBI did.  Agent Chambers visited the dealer to 'speak with' him about Turaani.  R.1 at 11. That does not suffice.  Contact does not equal coercion.  Chambers then asked to see the information Turaani provided when he tried to purchase the gun.  That is not enough.  Else, every law-enforcement inquiry could generate a lawsuit premised on an inquiry.  Chambers then showed the dealer a photograph of Turaani with an unknown man of apparent Middle Eastern descent, adding that he had concerns

---

[8] *See* 28 C.F.R. § 25.6.

[9] He also brought other claims against other defendants irrelevant to this analysis.  *See id.* at 315-16.

15

> 'with the company' Turaani 'keeps.' *Id.* That is not enough either.  Passing along
> information, and ambiguous information at that, is a distant cry from forcing action.

*Id.* at 316.  The court then held that "[a]n indirect theory of traceability requires that the government cajole, coerce, command." *Id.* (citing *Crawford v. U.S. Dep't of Transp.*, 868 F.3d 438, 457 (6th Cir. 2017)).  Thus, the Sixth Circuit rejected plaintiff Turaani's theory of causation, where the FBI's law enforcement inquiry into the third-party dealer frightened the dealer into voluntarily refusing to sell Turaani a firearm, depriving him of a firearm that he otherwise had a legal right to access under the Second Amendment (causing his injury-in-fact).  *See Turaani*, 988 F.3d at 316.

Here, AANA's theory is analogous to the one rejected in *Turaani*: according to AANA, the Secretary's *lack* of a law enforcement inquiry "emboldens" the third-party Insurers to voluntarily refuse to reimburse for CRNA- and physician-provided anesthesia services at equal rates, depriving health care providers (who provide CRNA-administered anesthesia services) of money that they otherwise have a legal right to access under the ACA (causing their injuries-in-fact).  (Doc. No. 13 at PageID# 120.)  In both cases, the third-party's intervening, voluntary action violates a right claimed by the plaintiff (causing the plaintiff's injury-in-fact).

Because the Sixth Circuit concluded in *Turaani* that such action is not traceable to the government, s*ee* 988 F.3d at 316, and because AANA's case is analogous to *Turaani*, this Court reaches the same result.  Thus, because the Secretary's alleged failure to initiate an enforcement action does nothing to "cajole, coerce, [or] command" the third-party Insurers to violate the ACA Nondiscrimination Provision, and because it exerts no "determinative or coercive effect" on them to do so, it too "is a distant cry from forcing action."  *Id.*

For its part, AANA ignores *Turaani* and instead relies on a distinguishable case from the Second Circuit.  In *NRDC*, the National Highway Traffic Safety Administration ("NHTSA") published

a final rule in December 2016 which raised civil penalties on automakers whose fleets fell short of the average fuel efficiency minimum prescribed by the Energy Policy and Conservation Act ("EPCA"). *See* 894 F.3d at 100-01.  After delaying the effective date of the rate increase throughout early 2017, the NHTSA reversed course in July 2017, publishing a new final rule indefinitely suspending the effective date of the civil penalty increase (the "Suspension Rule").  *See id.* at 102-03.  Several states and other environmental organizations directly petitioned the Second Circuit for administrative review of the Suspension Rule.  *See id.* at 103.[10]  "Members of the environmental organizations [] submitted declarations indicating that they live in polluted areas and along roadways and have suffered respiratory ailments[,]" which the Court determined constituted their injury-in-fact.  *Id.* at 104.  The Second Circuit found sufficient causation because the regulated third-party automakers, "by [their] own admission," conceded that if the National Highway Traffic Safety Administration imposed an increased penalty on them, that increased penalty "has the potential to affect automakers' business decisions and compliance approaches."  *NRDC*, 894 F.3d at 104-05.

However, the Insurers here have made no such admission; they have not conceded that a sudden increase in enforcement of the ACA Nondiscrimination Provision would influence a potential decision by them to equalize the reimbursement rates for CRNAs relative to physicians.  Thus, unlike NRDC, AANA lacks a critical admission by the Insurers that if the Secretary did begin "any enforcement of the [ACA Nondiscrimination Provision]" (Doc. No. 13 at PageID# 121), the Insurers would be "likely" to respond.  *Diamond Alternative Energy, LLC*, 145 S. Ct. at 2135 ("With respect

---

[10] *See* 49 U.S.C. § 32909 (allowing direct judicial review of final rules by the Courts of Appeals).

17

to causation . . . a court must conclude that third parties will ***likely*** react to the government regulation . . . in predictable ways that will likely cause (or redress) the plaintiff's injury.") (emphasis added).

AANA cites to *Akins* for the proposition that  "federal appellate courts have  already found that organizations have standing in similar circumstances and even went as far as to grant these organizations relief under the Administrative Procedures [sic] Act or the Mandamus Act."[11]  (Doc. No. 13 at PageID# 119.)  However, AANA's reading of *Akins* divorces the Supreme Court's standing analysis there from the statutory backdrop of the Federal Election Campaign Act ("FECA") and ignores how the FECA differs from the ACA.

In *Akins*, the Supreme Court noted that "Congress [] specifically provided in FECA that 'any person who believes a violation of this Act . . . has occurred, may file a complaint with the [Federal Election] Commission.  [Congress] has added that 'any party aggrieved by an order of the Commission dismissing a complaint filed by such party . . . may file a petition' in district court seeking review of that dismissal."  *Akins*, 524 U.S. at 19 (quoting 52 U.S.C. §§ 30109(a)(1) and 30109(8)(a)).[12]  A group of voters "filed a complaint with the FEC" alleging that the American Israel Political Action Committee ("AIPAC") exceeded a political expenditure limit set by the FECA, which triggered AIPAC's obligation to "register and make public [] information about [its] members, contributions, and expenditures[.]"  *Id.* at 16.  "AIPAC asked the FEC to dismiss the complaint" arguing that the voters had reached their conclusion by mistakenly categorizing AIPAC's membership outreach

---

[11] The Court notes that there is no 't' in "Akins" and there is no 's' in "Procedure."  *See Akins*, 424 U.S. at 13; 60 Stat. 237 (1946).

[12] The Court originally cited to 2 U.S.C. §§ 437g(a)(1) and 437g(a)(8)(A), but the Compilers of the United States Code transferred those provisions to 52 U.S.C. § 30109.

activities as political expenditures.  *Id.* at 16-17.  The FEC agreed with AIPAC's interpretation of FECA's requirements, and "[t]he FEC consequently dismissed the [voters'] complaint."  *Id.* at 18.

Then, the voters "sued in the district court pursuant to § 437g(a)(8), an unusual statutory provision which permits a complainant to bring to federal court an agency's refusal to institute enforcement proceedings, challenging the Commission's interpretation of the term 'political committee.'"  *Akins v. Fed. Election Comm'n*, 101 F.3d 731, 734 (D.C. Cir. 1996) (en banc), *vacated*, 524 U.S. 11 (1998) (contrasting *Heckler v. Chaney,* 470 U.S. 821, 831 (1985)).  On *certiorari*, the Supreme Court held that the voters' 'injury-in-fact' was their "inability to obtain . . . lists of AIPAC donors . . . and campaign related contributions and expenditures[.]"  *Akins*, 524 U.S at 21.  Regarding causation, it concluded that the voters' informational injury was "'fairly traceable' to the FEC's decision about which [the voters] complain."  *Id.* at 25.

Here, the missing piece for AANA's theory is that there is no analogue in the ACA to the FEC's "decision" in *Akins*.  Defendants' Reply explains this: "the FEC made an unfavorable determination to the voters and the voters' suit constituted a legal challenge to that determination[.]" (Doc. No. 17 at PageID# 194.)  The FECA imposes an obligation on the FEC to adjudicate administrative complaints, so a specific "order of the Commission dismissing a complaint" under 52 U.S.C § 30109(a)(8)(A) is not equivalent to the Secretary's general unwillingness to "determine[e] that a State has failed to substantially enforce" the ACA Nondiscrimination Provision under 42 U.S.C. § 300gg-22(a)(2).  Contacting the Secretary in vain without him ever making a determination, as AANA has allegedly done here (Doc. No. 1 at PageID#s 17-18), cannot be said to "cause" the CRNAs' injuries like the statutorily cognizable determination in the FEC's "order" of dismissal.  Thus, unlike

the voters in *Akins*, AANA's members cannot trace their injury to an actual adverse "determination" made by the Secretary.

Accordingly, the Court concludes that AANA has failed to trace its members' alleged injuries to the Secretary, and therefore has not satisfied the causation element of the standing inquiry.

### 3. Redressability

Defendants argue that AANA's members' injuries are not redressable because the "Court lacks authority to compel Defendants to take any particular enforcement action[,]" so "it is entirely speculative whether any order from this Court declaring the private health insurance companies' policies to be illegal and holding that Defendants have an obligation to enforce [the ACA Nondiscrimination Provision] would result in redress to any AANA member for their injury."  (Doc. No. 11-1 at PageID# 95.)  According to Defendants, "the Secretary might decide to pursue other violations of" the ACA Nondiscrimination Provision and "would also need to determine that state(s) are failing to substantially enforce" it.  (*Id.*)

AANA's Opposition does not clearly delineate between its analyses of causation and redressability.  (Doc. No. 13 at PageID# 118.)  However, in the section of its Opposition discussing the merits of its APA and Mandamus claims, AANA clarifies the judicial relief it requests:

> The AANA is not asking this Court to compel the government to enforce Section 2706 against the two insurance companies cited in the Complaint.  Rather, the Complaint seeks an order compelling Defendants to enforce the law generally — something that it has chosen not to do a single time in the 14-plus years that the statute has been in force.

(*Id.* at PageID# 124.)  AANA appears to rely on *In re Pub. Emps. for Env't Resp.*,  957 F.3d 267 (D.C. Cir. 2020) ("*PEER*") to connect its requested remedy to its members' alleged injuries when it argues that "*should the Court compel the Secretary to act*, any enforcement of the law will deter the insurance

20

companies from continuing to violate it, inuring to the benefit of the AANA's members." (*Id.* at PageID# 121) (emphasis added).

In Defendants' Reply, they argue that "while AANA may subjectively believe that redress is likely, its position amounts to unsupported speculation about how third parties would react to generalized enforcement activity." (Doc. No. 17 at PageID# 194.)

"'To determine whether an injury is redressable, [a court] must consider the relationship between the judicial relief requested and the injury suffered.'" *Sierra Club v. Tennessee Dep't of Env't & Conservation*, 133 F.4th 661, 672 (6th Cir. 2025) (quoting *California*, 593 U.S. at 671); *accord Murthy v. Missouri*, 603 U.S. 43, 73 (2024) (same). "[T]he injunctive relief in an associational-standing case must benefit (and ameliorate an injury to) the association's *members*." *Ass'n of Am. Physicians & Surgs*, 13 F.4th at 540. And as explained above, where a plaintiff traces their injury through third parties, "a court must conclude that third parties will likely react to the [judicial relief] in predictable ways that will likely [redress] the plaintiff's injury." *Diamond Alternative Energy, LLC*, 145 S. Ct. at 2135; *see also Sierra Club v. Tenn. Dep't of Env't & Conservation*, 133 F.4th 661, 672-73 (6th Cir. 2025) (quoting *R.K. by and through J.K. v. Lee*, 53 F.4th 995, 1001 (6th Cir. 2022)) (the plaintiff must "show that it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'").

AANA cites *PEER*, but the case is inapposite because the remedy AANA seeks is broader than the remedy sought in that case. *See* 957 F.3d at 267. In *PEER*, "organizations representing national park employees, visitors, and hiking guides [] filed a petition for a writ of mandamus that would compel the agencies to establish management plans or voluntary agreements within two years at seven parks" frequented by their members. *Id.* at 271. The members' alleged injuries were their "enjoyment

21

of the woods" which was "marred by the intrusive noise of overflights" above the parks.  *Id.*  The court explained that "[m]anagement plans may prohibit air tours [over the parks] altogether or establish certain conditions, including noise mitigation, and plans 'shall include incentives . . . for the adoption of quiet aircraft technology[.]"  *Id.* at 272 (citing 49 U.S.C. § 40128(b)(3)).  Without more analysis, the court concluded that the  "[p]lans and agreements are thus substantially likely to mitigate the noise impact of air tours."  *Id.*

What AANA seeks is different.  In *PEER*, the organizations' members asked the D.C. Circuit to "compel the agencies to establish management plans" at the seven (7) specific parks causing their noise-related injuries, and those plans necessarily included incentives for the air tour operators to adopt quieter technologies.  *See id.* at 267, 272.  AANA asks this Court for an "order compelling Defendants to enforce the law ***generally***[.]"  (Doc. No. 13 at PageID# 124) (emphasis added).  AANA does not seek an order "compel[ling] the government to enforce [the ACA Nondiscrimination Provision] against the two insurance companies cited in the Complaint."  (*Id.*)

AANA's broad request for relief is fatal to its case because an order to the Secretary to "generally" enforce a law leaves the Court speculating as to how such "general" enforcement could "likely" redress the CRNAs' injuries.  (*Id.*)  Even if the Secretary were to adopt AANA's position that the Reimbursement Policy violates the ACA Nondiscrimination Provision, the Secretary could bring enforcement actions against other insurers rather than against the Insurers purportedly causing the CRNAs' injuries.  (Doc. No. 17 at PageID# 194.)  According to AANA itself, "other industries experiencing varying levels of discriminatory conduct rooted solely in being non-physician providers have presented similar complaints to HHS[,]" and yet "HHS has not once enforced the ACA's ban on non-discrimination."  (Doc. No. 1 at PageID# 18-19.)  Given the alleged widespread violations across

several industries, it is unclear how AANA can ask this Court to predict that a general start-enforcement directive to the Secretary would "likely" solve CRNA-specific injuries.  (*Id.*)  And even if the Court issued such an order, AANA supplies no reason to predict that increased enforcement would "inure" to the financial benefit of CRNAs.  (Doc. No. 13 at PageID# 131.)  Increased enforcement might just as well backfire by causing the Insurers to 'comply' with the ACA Nondiscrimination Provision by *reducing* the reimbursement rate for physician-administered anesthesia services rather than raising it for CRNA-administered anesthesia services.  Such a response would equalize the reimbursement rate between CRNAs and physicians, eliminating the discrimination, but would fail to mitigate any of the financial harms AANA's members purport to suffer.  (*Id.*)

Therefore, the Court concludes that AANA has failed to satisfy the redressability element because the "general" enforcement order it seeks is too "speculative" to redress its members' financial injuries.  Accordingly, AANA has failed to demonstrate any of the elements for Article III standing, so this case is not a justiciable controversy under Article III, and the Court must dismiss the case for lack of subject matter jurisdiction.

## IV.    Conclusion

For the above reasons, Defendants' Motion is GRANTED (Doc. No. 11).  As ASA's Motion (Doc. No. 15) is directed at the merits of AANA's claims, and AANA's Motion for Leave (Doc. No. 22) introduces no new legal arguments relevant to this analysis, they are DENIED as moot.

23

**IT IS SO ORDERED.**

Dated: August 26, 2025                                          *s/ Pamela A. Barker*
                                                         PAMELA A. BARKER
                                                         UNITED STATES DISTRICT JUDGE